UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SERENIUM, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>JASON ZHOU, et al.,<br><br>    Defendants. | Case No. 20-cv-02132-BLF<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>[Re: ECF 86] |

Before the Court is Defendants' Motion to Dismiss the Second Amended Complaint under Fed. R. Civ. P 12(b)(2), (6), and (7) or to Compel Arbitration. Mot., ECF 86; *see also* Opp., ECF 93; Reply, ECF 100. The Court held a hearing on this motion on May 6, 2021. For the reasons discussed at the hearing and below, the Court GRANTS the Defendants' Motion to Dismiss for Lack of Personal Jurisdiction WITHOUT LEAVE TO AMEND.

**I.     BACKGROUND**

Serenium, a start-up company with its operational headquarters in Palo Alto, California and a technology development office in San Diego, California, was founded to develop technology relating to diagnosis and treatment of sleep apnea. ECF 82, Second Amended Complaint ("SAC") ¶ 1, 8. Serenium claims that it was approached by Defendant Jason Zhou ("Zhou"), a billionaire with interests in the British Virgin Islands, Cayman Islands, Hong Kong, and China. SAC ¶¶ 13, 63. Zhou is the founder, CEO, chairman, and controlling shareholder of Defendant New Century Healthcare Holding Co. Limited ("New Century"), which operates a number of hospitals in China. SAC ¶ 13. The parties entered into a joint venture in which Serenium developed sleep apnea technology and products that New Century would distribute and sell in Japan, South Korea, China, and Taiwan. SAC ¶ 1, 19. Following discussions and a meeting with New Century in Beijing,

Serenium disclosed its proprietary technology pursuant to a non-disclosure agreement ("NDA") to New Century. SAC ¶¶ 14-16, 20, 63-85. The NDA provided that it was "governed by Illinois law." SAC ¶ 76.

In late 2017, the parties began drafting Term Sheets that delineated the basic structure of the joint venture. SAC ¶¶ 93, 94, 99. The Term Sheets expressly stated that they would be replaced by a joint venture contract, known as the "Framework Contract," which would in turn be replaced by a detailed Shareholder Agreement. SAC ¶ 103. Beginning in January 2018, the parties exchanged twenty-one Framework Contract drafts. SAC ¶ 104. The Framework Contract drafts contemplated Serenium and Beijing Jiarun Yunzhong Health Technology Company Ltd. ("Beijing Jiarun") as parties. SAC ¶ 105. According to Serenium, Zhou and Defendant Jia Xiaofeng ("Jia"), New Century's Corporate Secretary and Beijing Jiarun's CEO, falsely held out Beijing Jiarun as part of New Century. SAC ¶¶ 17, 20, 105-108. Serenium and Beijing Jiarun ultimately opted not to enter into the contract. SAC ¶¶ 111-112.

Zhou later proposed that Serenium and non-party New Century (International) Co. Limited ("New Century International"), a New Century subsidiary, form a jointly owned holding company in Hong Kong aimed at "bring[ing] Serenium's technology to China and other Asian countries." SAC ¶¶ 113, 122. The holding company would allegedly be funded by New Century International, while Serenium would contribute the technology. SAC ¶¶ 114-115. This agreement was memorialized as the Framework Contract. *See* SAC ¶¶ 114-119. As part of the Framework Contract, New Century International had the option to purchase 19.9% of Serenium's equity based on a $25 million valuation. SAC ¶ 115.

Given "the protracted but fruitful negotiation of the Framework Contract, Serenium hired engineers and opened a San Diego Technology office." SAC ¶ 120. As months passed, however, New Century International failed to form the holding company contemplated by the Framework Contract. SAC ¶ 121. In the meantime, Serenium began to attempt compliance with Chinse regulatory requirements. SAC ¶¶ 121-124. In August 2018, New Century, at Zhou's direction, resolved not to form the holding company, and instead represented to Serenium that it needed further proof of the efficacy of Serenium technology. SAC ¶ 130. "However, Zhou wanted

Serenium to provide yet more information about its trade secrets so that New Century and Beijing Jiarun could use this information in providing their own in-house adult and pediatric sleep diagnostics and treatment. For this reason, New Century, Zhou, and Jia withheld from Serenium Zhou and New Century's decision to abandon the JV." SAC ¶ 130. Serenium continued to share its proprietary information, business plans, testing equipment, and trade secrets. SAC ¶¶ 131-135. For example, in October 2018, Serenium trained hundreds of doctors and medical professionals— represented to be employees of New Century—in Beijing on Serenium's technology. SAC ¶ 135.

By late 2018, the relationship between the parties broke down as Zhou refused to form the holding company. SAC ¶ 137. In March 2019, New Century International terminated the Framework Contract. New Century, however, refused to return Serenium's proprietary oximeters and failed to return or destroy Serenium's trade secrets as required by the NDA. SAC ¶¶ 140-141. According to Serenium, New Century is currently diagnosing and treating patients with Serenium's confidential information and intellectual property. SAC ¶ 142.

On March 27, 2020, Serenium sued New Century for breach of contract, *see* SAC ¶¶ 211-223, and New Century, Zhou, and Jia for misappropriation of trade secrets under 18 U.S.C. §§ 1836(b) and 1837, *see* SAC ¶¶ 224-250 and California Civil Code §§ 3426, *et seq.*, *see* SAC ¶¶ 251-254. Serenium's claims are predicated solely on New Century's obligations flowing from and conduct related to the NDA. SAC ¶¶ 212, 226, 242. Accordingly, the Court is precluded from considering factual allegations related to the Framework Contract, to which nonparty New Century International was a signatory.

**II.    DISCUSSION**

At top, the Court recognizes that Plaintiff has made extensive amendments to the pleadings. *Compare* SAC *with* First Amended Complaint ("FAC"), ECF 14. These amendments provide valuable details about the relationship between the parties and the relationship between Defendants and the State of California. *See, e.g.*, SAC ¶¶ 164-210. Nonetheless, the new allegations do not shift the fundamental nature of Defendants' connection to the State of California, and Plaintiff cannot escape this Court's previous conclusion that it lacks jurisdiction over the case. For the reasons discussed below, the Court DISMISSES all claims WITH

PREJUDICE.

### A. Lack of Personal Jurisdiction, Fed. R. Civ. P. 12(b)(2)

When a defendant raises a challenge to personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction over each defendant is proper. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). "Although the plaintiff cannot 'simply rest on the bare allegations of its complaint,' uncontroverted allegations in the complaint must be taken as true. Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal citations omitted). For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* at 801 (9th Cir. 2004) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Where there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits. *See* Fed. R. Civ. P. 4(k)(1)(A); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same. *See Panavision*, 141 F.3d at 1320 (citing Cal. Civ. Proc. Code § 410.10). For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316 (internal quotation marks and citation omitted).

The extent of "minimum contacts" required to find personal jurisdiction depends on whether specific or general personal jurisdiction is asserted. Because the parties do not contest the absence of general jurisdiction, the Court considers whether it has specific jurisdiction over the Defendants. *See* Mot. at 5; Opp. at 2; *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) (requiring that a defendant engage in "continuous and systematic general business contacts" for the court to exercise general personal jurisdiction).

4

Courts in the Ninth Circuit employ a three-prong test when determining whether a nonresident defendant may be subject to specific personal jurisdiction in a forum: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Schwarzenegger*, 374 F.3d at 802.

### i. Breach of Contract Claim: New Century

In cases sounding in contract, the Court applies "a 'purposeful availment' analysis and ask[s] whether a defendant has 'purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015) (quoting *Schwarzenegger*, 374 F.3d at 802). "[A] contract alone does not automatically establish minimum contacts in the plaintiff's home forum." *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008). Rather, this test requires that the defendant "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Id.* (internal citation and quotation omitted). "[P]rior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" are relevant to this inquiry, but in all cases, the "contact" must rise above "random, fortuitous, or attenuated" conduct within the forum. *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)). Critically, "the relationship between the nonresident defendant, the forum, and the litigation 'must arise out of contacts that the defendant himself creates with the forum State.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (internal quotation marks omitted).

Here, Plaintiff brings a claim against New Century for breach of the NDA. SAC ¶¶ 211-223. Defendants contend that the allegations flowing from the breach of the NDA—as opposed to allegations flowing from other aspects of the parties' business relationship—are insufficient to

5

1  establish the jurisdiction. Mot. at 10. They also argue that, even if the Court were to consider
2  allegations beyond the NDA, such allegations do not support a finding that New Century sought to
3  avail itself of the privilege of doing business in California. Mot. at 11. Serenium responds that
4  New Century purposefully availed itself of this privilege because (1) the parties contemplated
5  opening a San Diego development office, (2) the trade secrets protected by the NDA were
6  developed in California, and (3) New Century agreed to send patient data to Serenium in
7  California. Opp. at 4-5. They also argue that "[w]holly foreign acts may subject a defendant to
8  jurisdiction," *id*. at 6, and that the NDA was broad enough to encompass the parties' future
9  relationship, *id*. at 7.

10  The Court has reviewed Serenium's new jurisdictional allegations and finds that they fail
11  to establish that New Century "performed some type of affirmative conduct which allows or
12  promotes the transaction of business" within California. *Boschetto*, 539 F.3d at 1017 (internal
13  citation and quotation omitted). The SAC fails to establish that New Century intended to avail
14  itself of the privilege of doing business in California. While Serenium insists that New Century
15  agreed to pay Serenium to develop technology in California and to send patient date to California,
16  the record does not support this conclusion. Opp. at 3-4 (citing Rosen Decl., Exhs. D-E, ECF 95;
17  Zwerling Decl. ¶¶ 14, 18-19, 22, ECF 96). The evidence to which Serenium cites is devoid of
18  reference to California, reveals only that New Century was aware that Serenium employees were
19  located in California, and/or concerns allegations relating to the Framework Contract as opposed
20  to the NDA. Rosen Decl., Exhs. D ("New Century and Serenium agreed to set up a Joint Venture
21  to provide sleep apnea test related software and hardware technical services as well as data
22  analysis services in China Mainland, Chinese Hong Kong, Chinese Taipei, Japan and Korea."), E
23  (same); Zwerling Decl. ¶¶ 14, 18 ("During this process, Bing forwarded Jia and Zhou's promised
24  'Core Business Terms' Term Sheet to me in Palo Alto."), 19 ("Jia requested a call thereafter to
25  review the term sheet. I organized a teleconference, and called in from the Palo Alto office on
26  December 22, 2017."), 22 ("Serenium and its shareholders have the rights to sell all the share in
27  the Joint Venture and in Serenium in 5 years. New Century owns preemption."); *see also* Opp. at
28  3-4 (discussing new allegations in context of the joint venture); SAC ¶ 2 ("As a critical part of the

6

JV, New Century had to send data to Serenium's technology development office, to give Serenium the ability to finish building Versions 1.0 of the launch products.").

Instead, Serenium's theory of jurisdiction still hinges upon the numerosity of the contacts between Serenium and New Century. Serenium explains that over the fifteen months the parties worked together, its employees communicated frequently with New Century and its employees, ultimately developing a burgeoning business relationship. *See, e.g*, Zwerling Decl. ¶ 9 ("Over the 15 months of the collaboration, I estimate that I participated in hundreds of such meetings and calls, many lasting between 45 to 120 minutes."). But while Serenium further alleges that New Century was the driver of this relationship, it does not allege specific facts that speak to how New Century formed a "substantial connection" with the State of California. *See Burger King*, 471 U.S. at 475 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)); *see, e.g., Picot*, 780 F.3d at 1213 ("the fact that a contract envisions one party discharging its obligations in the forum state cannot, standing alone, justify the exercise of jurisdiction over another party to the contract."). And the Ninth Circuit has concluded that the "ordinary 'use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state.'" *Medimpact*, 2020 WL 1433327, at *8 (quoting *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) (internal quotation marks omitted)).

Serenium does allege that, in the course of the joint venture, it set up a San Diego Development Center, which it shut down when the partnership went downhill. SAC ¶¶ 1, 4, 7, 172-189. The operative complaint contains new allegations about Serenium's efforts to staff the center and the corresponding work employees completed at the center. *See id*. But Serenium does not allege facts to illustrate how New Century's conduct served the work of this California-based center. *See* SAC ¶ 178 ("Serenium actively began working on the Chinese version of Rev. 1 products."). There is nothing that indicates the center was discussed during negotiations between the parties. *See* Zwerling Decl. ¶ 30 ("As Serenium began preparing to open its San Diego Development Center, we *internally* discussed potential hires on January 14, 2018.") (emphasis added). Similarly, there is nothing that suggests New Century contemplated the center as a future consequence of the NDA—as opposed to a future consequence of the Framework Contract. *See*

7

1    Rosen Decl. ¶ 59 ("New Century knew that the joint venture's technology development work was

2    dependent on San Diego, and that Serenium's San Diego presence was to be, and was, expanded

3    given the contemplated joint venture."); *see also* Opp. at 4 (discussing opening of San Diego

4    Development Center in context of the parties' joint venture). And while New Century may have

5    asked how Serenium would finish its San Diego development work when Serenium's CTO

6    stepped down in late 2018, *see* SAC ¶ 186; Zwerling Decl. ¶ 24, this expressed concern alone does

7    not ground a finding of personal jurisdiction in California. *Cf. Picot*, 780 F.3d at 1213 ("the fact

8    that a contract envisions one party discharging its obligations in the forum state cannot, standing

9    alone, justify the exercise of jurisdiction over another party to the contract."). Indeed, New

10    Century likely would have had this concern regardless of where Serenium's CTO worked.

11         At bottom, none of New Century's alleged contacts occurred in California or concerned a

12    business venture in California. *See E\*Healthline.com, Inc. v. Pharmaniaga Berhad*, 2018 WL

13    5296291 at \*5 (E.D. Cal. Oct. 23, 2018) (finding it significant that a venture's "potential plans[]

14    and discussions were based on an entirely overseas venture"). Instead, New Century's actions

15    suggest that it availed itself of the privilege of conducting activities within China, Japan, South

16    Korea, and Taiwan. SAC ¶ 19. Serenium admits that China "provided a perfect market for

17    Serenium's technology," motivating its entry into the NDA. SAC ¶¶ 58-62. The in-person

18    meetings between the parties occurred in Beijing, China, not California. SAC ¶¶ 66, 135. The

19    parties entered the NDA to allow New Century to evaluate Serenium's technology and the

20    feasibility of a collaboration between the companies in the Chinese market. SAC ¶¶ 66-85.

21         The soundness of the Court's conclusion is illuminated by *Picot v. Weston*, 780 F.3d 1206

22    (9th Cir. 2015). In *Picot*, California-resident Picot and Michigan-resident Weston entered into an

23    agreement to develop and sell an electrolyte formula for use in hydrogen fuel cells. *Id*. at 1209.

24    Under the agreement, defendant Weston would "develop the technology, arrange for its testing,

25    and assist in fund-raising and marketing" in Michigan while Picot would "fulfill[] his obligations .

26    . . by seeking out investors and buyers in California." *Id*. at 1212-1213. In addition to his work in

27    Michigan, Weston made two trips to California "to develop and market the technology" pursuant

28    to the parties' contract. *Id*. at 1213. Despite this, the Court held that Weston's "transitory

presence" in California was insufficient to establish personal jurisdiction there. It also concluded that Picot's own conduct in California did not alter its jurisdictional analysis, explaining that "the fact that a contract envisions one party discharging its obligations in the forum state cannot, standing alone, justify the exercise of jurisdiction over another party to the contract." *Id.*; *see also Thomas P. Gonzalez Corp. v. Consejo Nacional De Produccion De Costa Rica*, 614 F.2d 1247, 1253-55 (9th Cir. 1980) ("It is not sufficient that the plaintiff is a California resident . . . or that an act outside California imposes an economic burden on a California resident."). So too here. This Court cannot exercise jurisdiction over New Century by virtue of the fact Serenium decided to discharge some of its contractual obligations in California.

Serenium tries to sidestep this problem by emphasizing that the NDA was broad enough to encompass the parties' future relationship. SAC ¶ 170; Opp. at 6-7. But it does not follow that sustained contacts with California—or even the contemplation of sustained contacts—inevitably flowed from the NDA. In *Walden v. Fiore*, the Supreme Court "made clear" that courts "must look to the defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum." *Axiom Foods*, 571 U.S. at 1070. Thus, "mere injury to a forum resident is not a sufficient connection to the forum," nor is defendant's knowledge of plaintiff's "'strong forum connections' ... combined" with the "foreseeable harm" the plaintiff suffered in the forum. *Walden*, 571 U.S. at 289-90.

The Court DISMISSES WITH PREJUDICE Serenium's breach of contract claim against New Century.

### ii. Tort Claims: all Defendants

In cases sounding in tort, courts apply the purposeful direction or "effects test," which requires that the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Picot*, 780 F.3d. at 1214 (internal quotation marks and citation omitted). The effects test is derived from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), which "stands for the proposition that purposeful availment is satisfied even by a defendant whose only contact with the forum state is the purposeful direction of a foreign act having effect in the forum state." *Dole Food*

*Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (internal quotation marks and citation omitted).

"A showing that a defendant purposefully directed his conduct toward a forum state . . . usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." *Schwarzenegger*, 374 F.3d at 803. Just as with contract claims, district courts must look at "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. In doing so, the court determines whether the alleged injury is specific to the plaintiff or whether it is "tethered to [the forum state] in any meaningful way." *Id*. at 290.

### a. New Century

Defendants posit that "there is nothing in the SAC that plausibly pleads that [New Century] did anything related to its alleged theft of [Serenium]'s trade secrets in California. [Serenium] itself sent the alleged trade secrets to China, and no meetings occurred in California." Mot. at 9. Serenium responds that New Century "took aim at California" because "[New Century], under the pretext of a JV with a substantial California component specifically aimed its conduct at Serenium's Californian C.E.O. and C.T.O., in order to acquire trade secrets, many of which were developed in California and sent from California." Opp. at 11 (internal citations omitted). Serenium also highlights new allegations about the San Diego Development Center. *Id*. at 11-12.

The second prong of the effects test is the death knell of this inquiry because Serenium fails to allege significant conduct by New Century directed expressly at California. In *E\*Healthline.com, Inc. v. Pharmaniaga Berhad*, 2018 WL 5296291 (E.D. Cal. Oct. 23, 2018), the Court considered a dispute between E\*Healthline.com, a healthcare software company headquartered in California, Pharmaniaga, a Malaysian company that developed and sold medical products, and Modern, an investment company based in Saudi Arabia. *Id.* at *1. The three entities contemplated forming a joint venture to develop a pharmaceutical facility in Saudi Arabia. *Id*. In exploring the venture, the trio signed NDAs, pursuant to which E\*Healthline.com provided confidential information and trade secrets to Pharmaniaga, primarily over the phone, teleconference, or email. *Id.* at *1, *5. At E\*Healthline.com's request, Pharmaniaga sent two

employees to California for a meeting, although no trade secrets were exchanged then. *Id.* at *5. When the venture fell apart, E*Healthline.com sued Pharmaniaga for the misappropriation of trade secrets and insisted that the district court had jurisdiction over Pharmaniaga in California because, among other things, Pharmaniaga "purposely directed their tortious action at California and engag[ed] in [misappropriation of confidential information] targeted at a plaintiff whom Pharmaniaga and Modern knew to be a resident of California." *Id*. at *1-2, *5 (internal quotation marks omitted, alterations in original). The district court, however, concluded that E*Healthline.com "failed to show any significant activities from Pharmaniaga directed at the forum" because there were no allegations that "any confidential information was misappropriated at the one California meeting" and "all choices of law, potential plans, and discussions were based on an entirely overseas venture, with no contemplation that California would play a role in any of it." *Id*. at *5.

The allegations in Serenium's complaint mirror those in *E*Healthline.com, Inc. v. Pharmaniaga Berhad*. Serenium, a company headquartered in California, entered into a business relationship with New Century, a company based overseas. Dealings between the companies concerned an overseas joint venture, with no contemplation that California, as opposed to Serenium, would play any central role in the venture. Just as E*Healthline.com sent its trade secrets to Pharmaniaga in Malaysia pursuant to an NDA governed by law outside the forum state, Serenium sent its trade secrets to New Century in China pursuant to an NDA governed by law outside the forum state. And here, unlike in *E*Healthline.com, Inc. v. Pharmaniaga Berhad*, there is not a single in-person visit in the United States, let alone California, between Serenium and any employee of New Century. Serenium cannot hail New Century into court in California under these facts. *See also Medimpact*, 2020 WL 1433327, at *9 (defendant did not expressly aim its conduct at California where the alleged misappropriation "was conducted outside of California such as in the countries of Ghana and Saudi Arabia"); *Beatport LLC v. SoundCloud Ltd*, No. CV 19-847 MRW, 2020 WL 3977602, at *5 (C.D. Cal. July 13, 2020) (no substantial contact with California where defendant reached out to plaintiff in California to set up a meeting in Germany at which the alleged misappropriation occurred).

11

This conclusion stands despite Serenium's new allegations that some of its trade secrets were developed in California. *See* SAC ¶¶ 190-196; Opp. at 11. In *Beatport LLC v. SoundCloud Ltd*, a court considered allegations by Plaintiff Beatport LLC that Defendant SoundCloud Ltd "lured Pulselocker"—a California company whose assets Beatport LLC had previous acquired— "into a German conference room and stole Pulselocker's non-public, proprietary technology." 2020 WL 3977602, at *1. Beatport LLC alleged that SoundCloud Europe "falsely led Pulselocker to believe that it [SoundCloud Europe] was interested in acquiring Pulselocker or its assets" and then "induced Pulselocker to disclose its [Pulselocker's] proprietary trade secret information." *Id*. (internal quotation marks omitted). This inducement was allegedly carried out with the help of an NDA between Pulselocker and SoundCloud Europe, pursuant to which Pulselocker began providing SoundCloud US and SoundCloud Europe with access to its technology. *Id*. at *2. Pulselocker also provided SoundCloud US and SoundCloud Europe with a "guided tour of Puselocker's trade secret technology" during a meeting in Berlin. *Id*. The California district court concluded that it did not have personal jurisdiction over SoundCloud Europe because "[a]t most, Plaintiff pleads . . . that SoundCloud Europe contacted Pulselocker in California to set up a meeting at which the trade secrets were to be swiped. The meeting itself occurred in Germany, though, under the terms of a contract pointing to English law and courts for potential relief. No substantial California contact there." *Id*. at *5. The court was not swayed by the fact that "Plaintiff's secrets had originally been stored in a data room in California" because "the complaint makes reasonably clear that the Pulselocker team sent this information to Germany and took it with them to present to SoundCloud Europe's tech team." *Id*.; *cf. ScaleMP, Inc. v. TidalScale, Inc.*, No. 18-CV-04716-EDL, 2019 WL 7877939, at *13 (N.D. Cal. Mar. 6, 2019) (focusing on the single contact during which defendant "acquired the information that was later allegedly misappropriated."). Serenium does not attempt to distinguish the facts in *Beatport LLC* from the ones before the Court now.

Serenium also contends that its San Diego Development Center is relevant to this jurisdictional analysis "because it is part and parcel of the contemplated ventures, and the contemplated ventures account for why [New Century] was soliciting Serenium's trade secrets in

12

the first place." Opp. at 11. But the Court is limited to considering contacts flowing from the alleged misappropriation by New Century that occurred pursuant to the NDA. SAC ¶¶ 226 ("These trade secrets were disclosed under the NDA between Serenium and New Century."), 242 ("Serenium disclosed its trade secrets to Defendants under an NDA Serenium executed in California."). Indeed, the joint venture was governed by the Framework Contract, which was signed by Serenium and non-party New Century International—not New Century. SAC ¶¶ 103-119, 140. And the SAC clearly indicates that the San Diego Development Center flowed from the joint venture discussions and Framework Contract, not the NDA. *See* SAC ¶ 120 ("Given the Term Sheets, and the protracted but fruitful negotiation of the Framework Contract, Serenium hired engineers and opened a San Diego Technology office."). While the Court understands that Serenium is attempting to ground jurisdiction in an alleged scheme by New Century to misappropriate Serenium trade secrets, the pleadings do not support such a finding because of the limited nature of the claims. *See* Mot. at 9 ("Because the SAC artfully pleads around the Framework Contract to avoid its expansive arbitration clause, the alleged JV contacts are not relevant to and must be disregarded in the jurisdictional analysis."); *compare with MedImpact Healthcare Sys., Inc. v. IQVIA Inc.*, No. 19CV1865-GPC(LL), 2020 WL 5064253, at *9 (S.D. Cal. Aug. 27, 2020).

Serenium relies on a smattering of cases in which courts have found that a defendant's claim-related contacts met the express aiming element. Mot. at 11-12. None of these cases carries the day for Serenium. In *DiscoverOrg Data, LLC v. Quantum Mkt. Research Inc.*, a Delaware corporation with a principal place of business in Nevada stole over 9,300 files from plaintiff's Washington-based servers. 2019 WL 5618670, at *1 (W.D. Wash. Oct. 31, 2019). The district court discussed purposeful direction inquiry within the context of internet torts, to include the presence of the plaintiff's servers in the forum and additional contacts between the defendant and the forum. *Id*. at 3*-4*. Here, Serenium voluntarily sent its trade secrets to China, where the alleged misappropriation occurred. Nor is this case akin to *Cray Inc. v. Raytheon Co.*, where the district court concluded it had personal jurisdiction over non-forum defendant Raytheon Company ("Raytheon") in a correction of inventorship claim. 179 F. Supp. 3d 977, 987 (W.D. Wash. Apr. 5,

13

2016). There, Washington-based plaintiff Cray Inc. ("Cray) entered into a contract with Sandia National Laboratories to develop supercomputing technology. *Id*. at 980. As part of this contract, Cray submitted "confidential and propriety information" to an oversight committee on which James Ballew, a Raytheon employee, sat. *Id*. Separately, Cray disclosed proprietary information to Raytheon under three NDAs so the company could evaluate the possibility of using Cray products. *Id*. Raytheon and Ballew later filed two patent applications relying on the information Cray disclosed. *Id*. at 980-91. The Washington district court's conclusion was derived from the fact that the technology at issue was developed in Washington and that Raytheon solicited proprietary information from Cray and its employees in Washington as well as through Ballew, who "worked and interacted with Cray employees residing in Seattle" during his participation on the oversight committee. *Id*. at 988. While Serenium's newly amended complaint alleges that it developed at least some of its trade secrets in California, *see* SAC ¶¶ 190-196, a character similar to Ballew does not feature in Serenium's narrative, whereby a New Century employee abused his or her legitimate position on an oversight committee to gain access to and solicit confidential information from Serenium employees. *See also Way.com, Inc. v. Singh*, 2018 WL 6704464, at *1 (N.D. Cal. Dec. 20, 2018) (finding personal jurisdiction where a California-based company alleged that a former California-based employee removed trade secret information from its California-based repositories and provided that information to his new employer, the defendant). And *Alexis v. Rogers,* concerned allegations of sexual assault, harassment, discrimination, and wrongful termination by an employee who worked remotely in California—a far cry from the factual allegations before the Court here. No. 15CV691-CAB-BLM, 2016 WL 11707630, at *1 (S.D. Cal. Feb. 26, 2016).

      Finally, Serenium contends that "[New Century]'s fraud was perpetrated through misrepresentations made by [New Century] employees to Serenium employees [New Century] knew to be in California. Serenium relied on these misrepresentations. Harmful communications constitute express aiming." Opp. at 12 (internal citations omitted). The caselaw Serenium cites in support of this argument is unavailing. *Dole Food Co., Inc. v. Watts* involved "an elaborate scheme to defraud Dole U.S." by two European citizens. 303 F. 3d 1104, 1109 (9th Cir. 2002).

14

The two individuals communicated extensively with Dole representatives in California, persuading them that they needed to "change Dole's European distribution approach from a 'cost and freight' system to a 'landed duty paid' ('LDP') system. *Id*. As part of the scheme, one of the defendants "traveled to California on multiple occasions and, while in California, encouraged Dole managers to change to the LDP system, advising them that they could save up to $2 million annually." *Id*. The Ninth Circuit concluded that the defendants' actions were expressly aimed at California because they "knew that Dole's principal place of business was in California, knew that the decisionmakers for Dole were located in California, and communicated directly with those California decisionmakers." *Id*. at 1112. The court cabined the reach of its decision, explaining that

> A finding of "express aiming" in this case does not mean "that a foreign act with foreseeable effects in the forum states always gives rise to specific jurisdiction." *Bancroft & Masters*, 223 F.3d at 1087. For example, we do not believe that the mere submission of a fraudulent time card by Dole employees in Europe would constitute a showing of express aiming at California. *Nor do we believe that personal jurisdiction may be asserted whenever a foreign employee communicates with a corporation's headquarters about foreign operations*.

*Id*. (emphasis added). The Ninth Circuit's warning in *Dole* applies here, where New Century employees communicated with Serenium about a foreign business opportunity. Moreover, there were no California meetings between the parties here. While this Court acknowledges that communications *may* form the basis for a finding of personal jurisdiction, the facts do not support such a finding here. This is particularly true given that this Court is limited to considering contacts flowing from misappropriation by New Century that occurred pursuant to the NDA. SAC ¶¶ 226, 242.

The Court DISMISSES WITH PREJUDICE Serenium's trade secret misappropriation claims against New Century.

   b. **Zhou and Jia**

Defendants also move to dismiss the trade secret claims against Zhou and Jia. Mot. at 13-14. Individuals are generally "not subject to personal jurisdiction based on acts undertaken in his or her corporate capacity" unless (1) the corporation "has no separate existence such that it might

be treated as the alter ego" of the individuals or (2) "where individual defendants are 'primary participants in an alleged wrongdoing.'" *Richmond Techs. Inc. v. Aumtech Bus. Solutions*, 2011 WL 2607158, at *6 (N.D. Cal. Jul 1. 2011). Because Serenium does not contest that it did not allege an alter ego theory, *see* Opp. at 13-15, the Court considers whether Serenium "allege[s] a viable theory of liability under which a suit might be brought against [Zhou or Jia] individually." *See Click v. Dorman Long Tech., Ltd.*, 2006 WL 2644889, at *4 (N.D. Cal. Sept. 14, 2006).

Serenium has failed to do so. There are no facts that illustrate that Zhou or Jia were primary participants in the alleged trade secret misappropriation. With respect to Zhou, Serenium contends that "the SAC alleges that Zhou himself misused Serenium's trade secrets and clarifies that he directed NCH to defraud Serenium for personal benefit. More, the SAC makes clear that Zhou was the guiding spirt behind NCH's theft." Opp. at 13 (internal citations omitted) (citing SAC ¶¶ 230, 247, 249). The Court previously found that "Serenium has not alleged that Zhou himself committed any tortious acts—only that he contacted Serenium to begin the parties' collaboration, attended meetings with Serenium in China, solicited confidential information from Serenium pursuant to the NDA, and proposed the parties form a joint venture." ECF 72 at 15. A review of the SAC does not reveal any new allegations that Zhou committed any tortious claim-related acts. *See generally* SAC § VI ("Jurisdictional Facts"). Instead, the SAC relies on high level allegations that fail to present a plausible claim or allegations related to the joint venture with New Century International. *See, e.g.*, SAC ¶¶ 93-98. To the extent that Serenium attempts to ground jurisdiction over Zhou in his participation in a fraudulent scheme to misappropriate, this Court has already concluded that the pleadings are too narrow to support such a conclusion. While the SAC includes more detailed allegations about Jia, the Court does not have jurisdiction over him for similar reasons. Serenium correctly contends that the SAC details numerous communications between Serenium employees and Jia. Opp. at 14; *see also* SAC ¶ 132 ("If not for New Century, Zhou, and Jia's misrepresentations, Serenium would not have disclosed additional confidential information, including trade secrets, to the Defendants."). But, as discussed above, these communications, without more, cannot ground jurisdiction. Finally, the Court finds that the SAC fails to specify the relevant corporate entity for which Jia and Zhou were acting at any given time.

*See, e.g.*, SAC ¶ 125 ("Jia and other New Century employees represented that New Century was prepared to form the holding company"). New Century and New Century International are separate corporate entities, and Serenium cannot interchange them as is convenient. These flaws are fatal. The Court DISMISSES WITH PREJUDICE Serenium's trade secret misappropriation claims against Zhou and Jia.

### B. Failure to State a Claim, Fed. R. Civ. P. 12(b)(6)

Because the Court grants the Defendants' motion to dismiss based on a lack of personal jurisdiction, it does not consider whether Serenium failed to state a claim under Fed. R. Civ. P. 12(b)(6). Mot. at 24-25.

### C. Failure to Join a Party, Fed. R. Civ. P. 12(b)(7)

Because the Court grants the Defendants' motion to dismiss based on a lack of personal jurisdiction, it does not consider pursuant to Fed. R. Civ. P. 12(b)(7) whether Serenium failed to join a party under Fed. R. Civ. P. 19. Mot. at 14-19.

### D. Motion to Compel Arbitration

Because the Court grants the Defendants' motion to dismiss based on a lack of personal jurisdiction, it does not consider their motion in the alternate to compel arbitration. Mot. at 19-24.

## III. ORDER

For the reasons discussed herein, the Defendants' motion to dismiss is GRANTED.

**IT IS HEREBY ORDERED.**

Dated: July 22, 2021

_____
BETH LABSON FREEMAN
United States District Judge

17